IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32027-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL RAMOS, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — In this appeal of his 2013 resentencing ordered by this court,
Joel Ramos argues that the United States Supreme Court's decision in *Miller v. Alabama*,
___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), includes constitutional
commands that are violated by the consecutive 20- and 25-year sentences that the trial
court imposed for four murders committed when Mr. Ramos was 14 years old. He argues
that under *Miller*, the court could impose a total period of incarceration of 85 years only
by finding "irreparable corruption," which was not shown in his case; that former RCW
9.94A.370 (1989)[1] cannot be applied and the Washington Supreme Court's decisions in
*State v. Law*, 154 Wn.2d 85, 110 P.3d 717 (2005) and *State v. Ha'mim*, 132 Wn.2d 834,
940 P.2d 633 (1997) cannot be followed in the case of a juvenile offender without

---

[1] RCW 9.94A.370 was recodified as RCW 9.94A.530 by LAWS OF 2001, ch. 10,
§ 6.

violating a mandate of *Miller* and the Eighth Amendment; that a sentencing court cannot apply standard sentencing ranges and consecutive sentencing presumptions to a juvenile without violating the Eighth Amendment; and that under *Miller*, a sentencing court cannot limit its consideration of the attributes of youth to assessing culpability for the crime. He also contends that the State violated a 1993 agreement under which Mr. Ramos entered a guilty plea in exchange for the State's recommendation of a total sentence of 80 years. He asks us to remand for resentencing before a different judge.

Mr. Ramos draws too much encouragement from the lengthy and largely general terms in which the majority opinion in *Miller* discusses juveniles' ordinarily diminished culpability and greater prospects of reform. Current adolescent brain science is relevant to the sentencing of every juvenile, but that does not mean that it has Eighth Amendment implications for the sentencing of every juvenile. The United States Supreme Court, state legislatures, and sentencing judges each apply current science within their respective realms. In the case of the United States Supreme Court, the only Eighth Amendment limitations on the states' plenary authority to define and impose punishment for state crimes has been to bar capital punishment for children, *Roper v. Simmons*, 543 U.S. 551, 572-73, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); to prohibit a sentence of life without the possibility of parole for a child who commits a nonhomicide offense, *Graham v. Florida*, 560 U.S. 48, 88, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); and, in *Miller*, to require

2

individualized sentencing, including consideration of the attributes of youth, for a child who commits a homicide. None of those three limitations applies in this case.

Review of the record satisfies us that the sentencing court understood the law, considered the evidence, and concluded that it did not support Mr. Ramos's argument that his reduced culpability supported an exceptional downward sentence. We will not substitute our judgment for that of the sentencing court. For that reason, and because the prosecutor did not commit misconduct, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

In 1993, Joel Ramos waived a declination hearing and entered a guilty plea to the first degree felony murders of Michael Skelton, his wife Lynn, and their 12-year-old son Jason; and to the premeditated intentional murder of Michael and Lynn Skelton's 6-year-old son Bryan. The homicides were committed by Mr. Ramos and Miguel Gaitan, both of whom were 14 years old at the time. In exchange for Mr. Ramos's guilty plea, the State agreed to recommend the minimum sentence possible under the standard sentencing range—consecutive 240 month terms on each count, for a total of 80 years. At the time of sentencing, the trial court stated that "the crimes 'have no parallel in Yakima County history for violence'" and noted that the premeditated intentional murder of Bryan Skelton deserved more than 240 months, but nonetheless imposed the requested sentence. *State v. Ramos*, 152 Wn. App. 684, 689, 217 P.3d 384 (2009) (*Ramos* II) (quoting the

3

report of the original sentencing hearing), *rev'd in part by State v. Ramos*, 171 Wn.2d.

46, 246 P.3d 811 (2011).

The facts of the crimes were recounted in the decision on appeal from the trial of

Mr. Gaitan. Tim Alvarado, a juvenile detention officer overheard Mr. Gaitan telling

another juvenile detainee about his and Mr. Ramos's murders of the members of the

Skelton family:

> Mr. Alvarado testified Mr. Gaitan said it was part of a gang initiation. He
> beat Mr. Skelton, then went to the bathroom where he used a bat to strike
> Mrs. Skelton as she left the shower. He attempted to stab her in the head,
> but the knife bent. Jason came in screaming, "Don't kill my mommy."
> They killed him as well.
>
> Mr. Gaitan said he and Mr. Ramos went back to the living room,
> where Mr. Skelton had revived. They killed him as he attempted to defend
> himself with a mop handle. As they went through the house taking items,
> they discovered Bryan in his bedroom. Mr. Ramos told Bryan to go to
> sleep, hit him in the head, then found Bryan's heart and stabbed him.

*State v. Gaitan*, noted at 80 Wn. App. 1077, 1996 WL 123155 at *3. The opinion

recounts that Mr. Gaitan told his fellow detainee that he and Mr. Ramos took "a Sega

Genesis game player, a VCR, a TV and a telephone from the house." *Id.*

Mr. Ramos's 1993 statement on plea of guilty admitted that he and Mr. Gaitan had

gone to the Skelton home at 10:00 or 11:00 p.m., armed with knives, with "a plan to

break in and rob." Clerk's Papers (CP) at 79. It stated:

> When we broke into the mobile home, Miguel went in first and I went in
> second. We were confronted by Mr. Skelton and a struggle took place and
> Mr. Skelton was killed. Mrs. Skelton was killed in the bathroom and Jason

> Skelton was killed nearby. During this time and at one point, I ran outside. But then I ran back in. Later while inside I picked up a piece of firewood and hit Brian Skelton in the head with it so he could not identify us later. The medical reports say that the blow killed him. We then took some personal property from the home and ran away.

*Id.* at 79-80.

Mr. Ramos did not file a contemporaneous appeal, but in 2006 filed a pro se appeal that the Washington Supreme Court ruled in 2008 could "proceed as a timely filed notice of appeal." Order, *State v. Ramos*, No. 80365-0 (Wash. Mar. 7, 2008) (*Ramos* I). After a further round of appeal to this court and the Washington Supreme Court, Mr. Ramos's case was remanded in 2011 for a full resentencing. *State v. Ramos*, 171 Wn.2d 46, 49, 246 P.3d 811 (2011) (*Ramos* III). Mr. Ramos sought an exceptional downward sentence based on his youth at the time of the crimes, evidence that Mr. Gaitan committed most of the violence, and Mr. Ramos's demonstrated rehabilitation, which he argued supported his reduced culpability for the crimes.[2]

At the 2011 resentencing, a new sentencing judge re-imposed the four consecutive 20-year sentences. In 2013, we reversed the resulting sentence and remanded. The State had argued at resentencing that the court could not impose an exceptional downward sentence notwithstanding *In re Mulholland*, 161 Wn.2d 322, 327-28, 166 P.3d 677

---

[2] A more detailed procedural history of events leading up to the 2011 resentencing is recounted in *State v. Ramos*, noted at 174 Wn. App. 1042, 2013 WL 1628255 at *1-3 (*Ramos* IV) and will not be repeated here.

(2007), and it appeared the court might have been persuaded by the State's argument. *Ramos* IV, 2013 WL 1628255 at *8-9. We made it clear in remanding that the court did enjoy such discretion. We also discussed the relevance and admissibility of evidence of intervening adolescent brain science:

> The legislature has been persuaded that, prospectively, adolescent brain science supports eliminating mandatory minimum sentencing for first degree murders committed by juveniles. While Mr. Ramos cannot claim the benefit of the prospective change to RCW 9.94A.540, he can at least ask that the court consider his request for an exceptional sentence based on the underlying science that developed pending finality of his sentence— something anticipated in [*State v.*] *Ha'mim.*
>
> We do not mean to express a view on how the trial court should exercise its discretion. Mr. Ramos committed a heinous crime. The appropriate sentence is the trial court's domain. We only point out that Mr. Ramos has presented real reasons why a court might choose to reduce his sentence. He should have the opportunity to have his request considered with the correct law in mind.

*Id.* at *16.

> In a concurring opinion, Judge Korsmo cautioned:

> There is nothing to prohibit the prosecutor from arguing against an exceptional sentence (while maintaining its 80-year recommendation), and Mr. Ramos's actions in slaughtering a young boy in order not to have any witnesses seriously undercut his argument that he was a follower rather than an equally culpable actor. A full resentencing could just as easily result in a standard range sentence of 106 years rather than the 80 years recommended by the prosecutor.

*Id.* at *18 n.4. It is from the result of the subsequent resentencing that Mr. Ramos now appeals.

*The 2013 resentencing hearing*

The resentencing conducted following our 2013 remand took place on October 14 and 15, 2013. Before the court was Mr. Ramos's 50-paged Motion for Resentencing Below the Standard Range submitted in 2011, which addressed his "neglect, immaturity, drug use, follower status, and personal losses," which he argued "contributed to this crime" and "mitigate Mr. Ramos' culpability and show his capacity for rehabilitation." CP at 19. It also addressed his "exceptional history of positive prison behavior, learning, and emotional development," which he argued were "relevant to his capacity to change and achieve rehabilitation." *Id.* The 224 pages of appendices to the motion included records relating to his positive behavior, schooling and other program participation while incarcerated, and almost 100 pages of supportive letters.

Also before the court was Mr. Ramos's 51-paged Memorandum Re: Resentencing, which included an updated discussion of intervening science, intervening case law, and proposed Washington legislation addressing juvenile sentences. In 2012, the United States Supreme Court had held in *Miller* that it was a violation of the Eighth Amendment for a state to apply a statutorily mandated sentence of life without parole to an offender who committed a homicide while age 17 or younger. The appendices to Mr. Ramos's memorandum included reports on legislation that had been proposed during the 2013 session of the Washington legislature to address the resentencing of juveniles serving life

7

sentences without the possibility of parole in light of the decision in *Miller*. They also included additional letters of support for leniency.

Mr. Ramos submitted a report expressing the opinion of Dr. Mark Mays, a clinical psychologist, as to Mr. Ramos's current functioning, describing him as not aggressive or violent, and having good behavioral control. Dr. Mays reported that even though Mr. Ramos had spent two decades incarcerated, he was psychologically well-adjusted and "appears to be a person without behavioral difficulties." CP at 1032.

Mr. Ramos called seven witnesses at the resentencing hearing. Four were family members, three of whom (two brothers and a brother-in-law) had known Mr. Ramos before the murders and testified that the crime was an aberrational act for Mr. Ramos, whom they characterized as having been a normal child.

Christopher Rogers, a former inmate at Airway Heights, appeared for the defense and testified that Mr. Ramos helped him stay out of trouble while incarcerated and provided advice that helped him restore a relationship with his parents and embark on a productive path following his release. Mark Dhaenens, the manager of the textile operations for the Department of Corrections, testified that he met Mr. Ramos while working as a vocational instructor at Airway Heights Correction Center. He testified that he had worked with Mr. Ramos for about five years, had taught Mr. Ramos upholstery skills, and that Mr. Ramos had an excellent attitude and had advanced to the top pay grade in the textile shop.

Finally, Mr. Ramos called Dr. Terry Lee, an expert in the field of adolescent behavior and brain development, who narrated a slide presentation on adolescent brain development without objection by the State and responded to questioning thereafter.

The State called Tim Alvarado, the juvenile detention employee who had overheard Mr. Gaitan describe his and Mr. Ramos's crime to Jaime Silva, another detainee, in May 1993, roughly six weeks after the murders. The prosecutor questioned Mr. Alvarado about what Mr. Gaitan said about the planning of the crime and Mr. Ramos's role. Mr. Alvarado's contemporaneous written statement of what he overheard in May 1993 had been admitted to support Mr. Ramos's 1993 plea of guilty.

Mr. Alvarado testified that among the details of the crime that he heard Mr. Gaitan describe was that his and Mr. Ramos's instructions for the gang initiation were that they were to burglarize the house and "[i]f anybody was there, they were supposed to take care of them." Report of Proceedings (RP) at 49. According to Mr. Alvarado, Mr. Gaitan said that he and Mr. Ramos approached the home wearing gloves and armed with knives. Anticipating that family members would be present, Mr. Gaitan entered through the front door and Mr. Ramos entered through the back. Their plan, if family members were present, was to kill the father first because they expected him to be in the living room "and he was the biggest and the strongest, so they wanted to take care of him first." *Id.* at 50.

According to Mr. Alvarado, Mr. Gaitan said that Mr. Skelton came at him yelling when they entered the home. Mr. Gaitan told Mr. Silva that he hit Mr. Skelton with a bat-like weapon in the head, Mr. Skelton fell to the ground, and Mr. Ramos stabbed Mr. Skelton in the stomach. Mr. Gaitan said that after that he (Mr. Gaitan) killed Lynn and Jason Skelton. Mr. Gaitan told Mr. Silva that he and Mr. Ramos then re-encountered Mr. Skelton in the living room and that Mr. Skelton swung at them with a mop handle but they had managed to knock him down. Mr. Alvarado testified that Mr. Gaitan said Mr. Ramos "stabbed the father repeatedly in the back until he was dead." *Id.* at 59.

Finally, Mr. Alvarado testified that Mr. Gaitan said he had found Bryan Skelton in bed, hiding under his covers, and went to tell Mr. Ramos. According to Mr. Alvarado, Mr. Gaitan said that after he and Mr. Ramos returned to the boy's room and told Bryan to put the blankets over his head and go to sleep, Mr. Ramos first hit Bryan in the head several times with a piece of wood and then "got on his chest, found where his heart was, stabbed him through the chest, they heard a gurgling sound, and it was with such thrust it went all the way through." *Id.* at 60.

To challenge the reliability of what Mr. Alvarado overheard, Mr. Ramos offered portions of the transcript of the Gaitan trial, reflecting the testimony of four juvenile detainees as to what Mr. Gaitan had told them, which the sentencing court admitted. According to Mr. Ramos's lawyer, "Every story is different and they all differ from the confession [Mr. Gaitan] made." *Id.* at 63.

10

The State also called James Sherman and George Town, both of whom, as detectives, had worked the homicide of the Skelton family and interviewed, or attempted to interview, Mr. Ramos. Detective Sherman described Mr. Ramos at 14 years old as having been cocky and disrespectful, but testified that he believed that Mr. Gaitan was the instigator of the homicides. The detective also testified that he had transported Mr. Ramos from the prison at Airway Heights to Yakima a couple of years before the resentencing hearing and that Mr. Ramos appeared to have matured; he described Mr. Ramos as polite and cooperative, and as even exhibiting a sense of humor.

At the conclusion of a day's worth of testimony and following Mr. Ramos's allocution, the court posed several legal questions for the lawyers to address in their arguments the following morning. Among others, the court asked how "the scope and extent of . . . discretion under Washington's Sentencing Reform Act as interpreted by [*State v. Law*] compared with the more expansive discretion that the Court would have under the federal Sentencing Reform Act under the United States Supreme Court case of [*Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011)]." RP at 128-29. The next morning both the prosecutor and Mr. Ramos's lawyer addressed the court's questions from the day before.

In arguing for an exceptional sentence downward, Mr. Ramos's lawyer pointed out that her client had little control over his home environment, was vulnerable to peer pressure and negative influences, that he experienced trauma at a young age, including

11

abuse, neglect, the death of his sister, and that he had language problems at school. Stressing the fact that Mr. Ramos immediately showed signs of rehabilitation after arriving at a juvenile detention facility, she argued "[t]he rehabilitation is clearly relevant to seeing that as a 14 year old, no, he wasn't incorrigible. His traits weren't fixed. He was capable of change and rehabilitation." *Id.* at 153.

In announcing its sentencing decision, the court acknowledged its discretion to reconsider the original sentence and impose concurrent sentences as an exceptional sentence downward. It discussed *Miller*, observing that it did not prohibit an individualized sentence of lifetime without parole for a juvenile found guilty of a homicide but only the mandatory imposition of such a sentence.

The court stated that in imposing Mr. Ramos's sentence it was guided by former RCW 9.94A.390 (1990),[3] which addressed mitigating circumstances applicable at the time the offenses were committed and that it was also guided by the adolescent brain science considerations set forth in *Miller* and related cases.

The court then reviewed the facts of the crime, noting that "by all accounts it was a horrific crime that wiped out an entire family in one night." RP at 171. It acknowledged that Mr. Ramos was only 14 years old at the time of the murders and noted Dr. Lee's presentation on the maturing of the human brain. The court then turned to the

---

[3] RCW 9.94A.390 was recodified as RCW 9.94A.535 by LAWS OF 2001, ch. 10, § 6.

12

scientific evidence of the three significant gaps between juveniles and adults identified by

*Miller*, 132 S. Ct. at 2464, and addressed their application to Mr. Ramos's crimes, stating

in part:

> "First, children have a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk taking."
>
> When I look at this case, I do not see impulsive acts. These acts were planned. Mr. Ramos and Mr. Gaitan armed themselves. They entered both available exits to prevent escape. They killed each family member systematically. Then they killed the last child for the stated purpose of eliminating witnesses. Those were not indicative of impulsive acts.
>
> Second, "Children are more vulnerable to negative influences and outside pressures and lack the ability to extricate themselves from horrific crime-producing settings." Stated another way, Dr. Lee indicated in his presentation that the adolescent mind cannot appreciate the consequences in the future of their current actions.
>
> In this case, unlike the presentation, Mr. Ramos went back into the Skelton family home, took a block of wood, and bashed in the head of a six year old boy hiding under the covers in his own bed. He did this for the stated purpose of eliminating a witness. That evidences to me a clear, cold, calculating decision of a mind fully cognizant of future consequences.
>
> Third, the United States Supreme Court stated that a juvenile's actions are less likely to be evidence of irretrievable depravity. In weighing these actions, I believe they were monstrous.
>
> Whether we look to the four penological justifications set forth in [*Miller*] or the stated purposes of Washington Sentencing Reform Act found in former RCW 9.94A.010 [1981], in balance they do not create a substantial and compelling reason for me to run these sentencing [sic] concurrently.

RP at 173-74.

The court continued that "[i]n [*Miller*] the Court was faced with one murder. Here we have four. . . . [T]he meaningful opportunity [for] release referenced in [*Graham*] cannot logically be extended to situations of multiple murders that present themselves here." RP at 174.

The court imposed a standard range sentence of 85 years based on three consecutive sentences of 20 years for the three counts of first degree felony murder (the murders of Mike, Lynn and Jason Skelton) and one term of 25 years for one count of premeditated intentional murder (the murder of Bryan Skelton). The standard range for each of the courts for an offender with no criminal history was 240 to 320 months. Mr. Ramos appeals.

## ANALYSIS

Mr. Ramos's briefing on appeal discusses at length the attributes of youth that bear on culpability as discussed by the United States Supreme Court in *Miller*, *Roper*, and *Graham*. He argues that his consecutive 20- and 25-year sentences fail under *Miller*'s asserted constitutional commands in four respects.

He argues that *Miller* holds that "a severe sentence [equivalent to life in prison], even for a horrible crime, is constitutionally permissible only in the rarest of circumstances where there is proof of 'irreparable corruption,' 132 S. Ct. at 2469," and "Mr. Ramos's impressive record . . . demonstrates he is not irredeemable." *See* Br. of Appellant at 13-15. He makes the related argument that imposing a sentence that does

14

not include an opportunity for his release based on rehabilitation violates the Eighth Amendment where he is not irreparably corrupt or beyond redemption. *See id.* at 29-31.

He argues that the sentencing court's reliance on former RCW 9.94A.390(1) (1990) and the Washington Supreme Court's decision in *Law* limited its consideration such that it "could not meaningfully consider the mandate of *Miller* and the Eighth Amendment analysis of *Graham* and *Roper*," which Mr. Ramos views as being that a sentencing court "'must' take into account [a] child's 'background and emotional development.'" *See* Br. of Appellant at 15-20 (quoting *Miller*, 132 S. Ct. at 2467).

He argues that the sentencing court could not apply the statutory presumptions of standard sentencing ranges and consecutive sentences provided by former RCW 9.94A.120(1) (1992)[4] and RCW 9.94A.400(1)(b) (1990)[5] without thereby violating the Eighth Amendment as construed by *Miller*. *See* Br. of Appellant at 20-22.

He argues that the sentencing court "considered the attributes of youth only in the context of the crime itself" in violation of the Eighth Amendment. *See id.* at 22-29.

He finally argues that the State breached its obligations under the 1993 plea agreement in the course of argument at the sentencing hearing.

---

[4] RCW 9.94A.120 was recodified as RCW 9.94A.505 by LAWS OF 2001, ch. 10, § 6.

[5] RCW 9.94A.400 was recodified as RCW 9.94A.589 by LAWS OF 2001, ch. 10, § 6.

After an overview of the law applicable to the sentence for this 1993 crime, we address the asserted errors in turn.

## I. *Applicable law*

"'Fixing of penalties or punishments for criminal offenses is a legislative function, and the power of the legislature in that respect is plenary and subject only to constitutional provisions against excessive fines and cruel and unusual punishment.'" *State v. Thorne*, 129 Wn.2d 736, 767, 921 P.2d 514 (1996) (quoting *State v. Mulcare*, 189 Wash. 625, 628, 66 P.2d 360 (1937)), *abrogated on other grounds by Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, a trial court must generally impose a sentence within the statutory standard range. Former RCW 9.94A.120(1) (1992). Yet "[t]he court may impose a sentence outside the standard sentence range for that offense if it finds, considering the purpose of [the SRA], that there are substantial and compelling reasons justifying an exceptional sentence." Former RCW 9.94A.120(2) (1992). The SRA sets forth nonexclusive "illustrative" mitigating factors, all of which our Supreme Court has observed "relate directly to the crime or the defendant's culpability for the crime." *Law*, 154 Wn.2d at 95; former RCW 9.94A.390(1).

In a series of decisions—most recently *Law*—our Supreme Court has clearly and consistently held that "the SRA requires factors that serve as justification for an exceptional sentence to relate to the crime, the defendant's culpability for the crime, or

16

the past criminal record of the defendant." *Law*, 154 Wn.2d at 89. A mitigating factor

"'must relate to the crime and make it more, or less, egregious.'" *Id.* at 98 (quoting *State*

*v. Fowler*, 145 Wn.2d 400, 404, 38 P.3d 385 (2002)). The court has viewed this

limitation as required by the nondiscrimination mandate of the SRA, which provides that

sentences be imposed "without discrimination as to any element that does not relate to the

crime or the previous record of the defendant." RCW 9.94A.340. Thus, the fact that an

offender successfully completed a drug rehabilitation program and re-established a

positive relationship with her two children, whom the court hoped to see reunited with

their mother rather than remain in foster care, was found to be non-crime-related and

therefore an improper mitigating factor in *Law*. 154 Wn.2d at 104. An offender's low

threat to the public and the court's concern for the offender's opportunity to improve

herself and frugal use of State resources were found to be improper mitigating factors in

*State v. Pascal*, 108 Wn.2d 125, 137-38, 736 P.2d 1065 (1987). A court's desire to see

an atypically altruistic defendant given an opportunity to improve herself rather than

further overcrowd jail facilities was found to be an improper mitigating factor in *State v.*

*Freitag*, 127 Wn.2d 141, 144-45, 896 P.2d 1254 (1995).

"Age alone" was found to be an improper mitigating factor in *Ha'mim*, but as we

explained in *Ramos* IV, the decision in *Ha'mim* anticipated that age would be a relevant

mitigating factor if the attributes of youth were relevant to culpability for a crime:

17

> In holding that the trial court [in *Ha'mim*] erred in relying on the defendant's youth, the Supreme Court made clear that the age of a young adult "is not *alone*" a mitigating factor. 132 Wn.2d at 847 (emphasis added). In reaching that conclusion, it acknowledged that a defendant's youth could be relevant to one of the illustrative mitigating factors identified by the legislature, that being that "the defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law was significantly impaired." *Id.* at 846 (citing former RCW 9.94A.390(1)(e), *recodified as* RCW 9.94A.535(1)(e)).

> Eight years after *Ha'mim*, and following *Roper*, our legislature found that "adolescent brains, and thus adolescent intellectual and emotional capabilities, differ significantly from those of mature adults. It is appropriate to take these differences into consideration when sentencing juveniles tried as adults," and amended RCW 9.94A.540 prospectively.[6] The Supreme Court anticipated in *Ha'mim* that if evidence demonstrated that culpability was diminished because of youth, it would be a factor that may be considered in sentencing. The legislature's finding and United States Supreme Court recognition support the viability of the brain science offered by Mr. Ramos. It is relevant to a request for an exceptional downward sentence.

*Ramos* IV, 2013 WL 1628255 at *13.

Following Mr. Ramos's 2013 resentencing, the Washington legislature amended the SRA in respects that will afford relief to offenders who committed crimes as juveniles decades ago and face lengthy continuing incarceration. Among the changes was the addition of a new section to chapter 9.94A RCW that provides a prospect of early release to Mr. Ramos and others. It provides in part as follows:

---

[6] The 2005 changes excluded juveniles tried as adults from the mandatory minimum terms imposed by RCW 9.94A.540, but only as to crimes committed on or after the effective date of the act. *See* LAWS OF 2005, ch. 437, § 2.

18

Notwithstanding any other provision of this chapter, any person convicted of one or more crimes committed prior to the person's eighteenth birthday may petition the indeterminate sentence review board [ISRB] for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday, the person has not committed a major violation in the twelve months prior to filing the petition for early release, and the current sentence was not imposed under RCW 10.95.030 or 9.94A.507.

LAWS OF 2014, ch. 130, § 10. At the time of oral argument of this appeal, it was represented that Mr. Ramos had petitioned the ISRB for early release.[7]

We turn to Mr. Ramos's arguments from the asserted mandates of *Miller*.

> *II. Miller does not hold that a sentence equivalent to life in prison is constitutionally permissible only where there is proof of "irreparable corruption"*

The Eighth Amendment to the United States Constitution proscribes the infliction of "cruel and unusual punishment." For the most part, the United States Supreme Court's precedents applying the Eighth Amendment "consider punishments challenged not as inherently barbaric but as disproportionate to the crime," *Graham*, 560 U.S. at 59, and disproportionate punishment was at issue in *Roper*, *Graham*, and *Miller*, the three cases in which, relying on the Eighth Amendment, the Court respectively invalidated the death penalty for all juvenile offenders under age 18, invalidated the sentence of life without

---

[7] Wash. Court of Appeals oral argument, *State v. Ramos*, No. 32027-8-III (Mar. 18, 2015) at 26 min., 40 sec. through 28 min., 50 sec. (on file with court).

19

parole for juvenile nonhomicide offenders, and invalidated the mandatory sentence of life without parole for juvenile homicide offenders. In invalidating mandatory sentences of life without parole for juveniles who commit homicides, the Court explained that mandatory sentences "prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller*, 132 S. Ct. at 2466. In so doing, it pointed out that it still recognized the distinction drawn between homicide and nonhomicide offenses in *Graham*:

> [O]ur decision today retains that distinction: *Graham* established one rule (a flat ban [on life without parole sentences]) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses.

132 S. Ct. at 2466 n.6.

The two defendants whose sentences were before the court in *Miller* had each received a mandatory sentence of life without parole for separate single murders, in robberies gone bad. Mr. Ramos, by contrast, received 20-year sentences (the low end of the standard range) for the three counts of first degree felony murder to which he pleaded guilty, and a 25-year sentence for the one count of premeditated intentional murder to which he pleaded guilty. *Miller* does not apply, by its terms, to his sentence.

He nonetheless argues that mandates announced in *Miller* do apply, the first being *Miller*'s asserted requirement that a sentence equivalent to life in prison (and here, that

20

would be Mr. Ramos's total sentence, for the four crimes) is constitutionally permissible only where there is proof of "irreparable corruption."

Mr. Ramos cites to *Miller*, at 132 S. Ct. at 2469, for this proposition, and presumably to the following language that appears on that page of the Court's opinion:

> [W]e do not consider [the petitioners'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S., at 573, 125 S. Ct. 1183; *Graham*, 560 U.S., at ——, 130 S. Ct., at 2026-2027. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

"[T]his harshest possible penalty" for juveniles to which *Miller* refers is, of course, a life sentence without parole—the subject matter of the Court's decision. In *Graham*, the Court recognized that a concern that a defendant is irreparably corrupt or incorrigible is relevant to the penological goal of incapacitation, one of the four goals of imprisonment that the Court has recognized as legitimate. *Graham*, 560 U.S. at 71. It concluded, however, that "while incapacitation may be a legitimate penological goal sufficient to justify life without parole in other contexts, it is inadequate to justify [life without parole] for juveniles who did not commit homicide." *Graham*, 560 U.S. at 72.

21

The other penological goals recognized by the Court as legitimate are retribution, deterrence, and rehabilitation, and the Court reiterated in *Graham* that "choosing among [penological goals] is within a legislature's discretion." *Id.* at 71 (citing *Harmelin v. Michigan*, 501 U.S. 957, 999, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (opinion of Kennedy, J.)). Penological goals of retribution and deterrence can be served without demonstrating that an offender is irreparably corrupt.

We also note that even as applied to sentences of life without parole, *Miller* suggests it will be the "uncommon" case where that sentence will be imposed but it "do[es] not foreclose a sentencer's ability to make that judgment in homicide cases." *Miller*, 132 S. Ct. at 2469. And in setting forth what it requires of a sentencer who does make that judgment in a homicide case, it does not say that he or she must find "irreparable corruption" but only that he or she is "require[d] . . . to take into account how children are different." *Id.* Of course, the court in this case did not impose a life sentence without parole for any of the murders; it imposed 20- and 25-year sentences.

Mr. Ramos's related argument that *Miller* mandates that a sentence without an opportunity for release based on rehabilitation violates the Eighth Amendment fails for the same reason: *Miller* explicitly recognizes that even a life sentence without parole may

22

be imposed on a juvenile offender as long as it is an individualized sentence arrived at after considering, among other factors, the attributes of youth.[8]

*Miller* did not involve nonlife sentences, it did not involve multiple homicides by an offender, and it did not announce a constitutional command that a sentencing court find "irreparable corruption" before imposing a sentence. *Miller*'s language about irreparable corruption affords no basis for reversing Mr. Ramos's sentence and remanding for a further resentencing.

> *III. Neither the SRA nor* State v. Law *limited the sentencing court's consideration of the attributes of Mr. Ramos's youth in a manner that violates the Eighth Amendment as applied in* Miller

Mr. Ramos next draws attention to statements by the sentencing court in announcing its sentencing decision that he argues show that the court was "restricted by the criteria of the exceptional sentence statute and case law interpreting that statute" and "could not meaningfully consider the mandate of *Miller* and the Eighth Amendment . . .

---

[8] If one were to read *Miller* to create an Eighth Amendment right to review for possible early release for juvenile offenders based on demonstrated rehabilitation, then the 2014 legislation under which Mr. Ramos may petition the ISRB for early release (and is reportedly doing so) would be relevant. Mr. Ramos argues that it is not, citing the California Supreme Court's decision in *People v. Gutierrez*, 58 Cal. 4th 1354, 1384, 171 Cal. Rptr. 3d 421, 324 P.3d 245 (2014). But in *Guitterrez*, the court said only that post-*Miller* legislation providing an opportunity for a juvenile offender to seek recall and resentencing would not cure the constitutional infirmity of a sentence imposed without individualized consideration of the transitory emotional and mental immaturity of youth. If an independent Eighth Amendment right to release based on rehabilitation were held to exist, then the 2014 legislation would have to be considered in determining whether the right to review provided by that legislation was sufficient.

when it adhered to a sentencing scheme that precludes reducing a person's sentence based on personal characteristics." Br. of Appellant at 19-20. Mr. Ramos argues that *Miller* requires us to employ constitutional avoidance in applying former RCW 9.94A.120 (1992) and to re-examine *Law*. We believe, as we did in remanding the case in 2013, that the statute and the case law permit consideration of the attributes of youth, including emerging brain science. The record reveals that the sentencing court considered those matters including as further discussed in *Miller* even though *Miller* involved only life sentences without parole.

Mr. Ramos relies on the following statements by the sentencing court which he contends demonstrate that it failed to consider Mr. Ramos's age at the time of the crime and how it might affect his culpability:

> The question [whether to exercise the discretion recognized by *Mulholland* to impose an exceptional downward sentence] hinges on whether or not under former RCW 9.94A.120 [1992] I find a substantial and compelling reason to justify the exceptional sentence requested by Mr. Ramos.
>
> To determine this I am guided by [former] RCW 9.94A.390(1) [1990], and that's the former statute applicable at the time in question, which sets forth the mitigating circumstances.

RP at 169, and

> I have attempted to restrict my considerations to those authorized by the en banc holding of the Washington State Supreme Court in [*State v. Law*] and in compliance with RCW 9.94A.340 to the extent they do not restrict my consideration of factors under RCW 9.94A.010 [1981] on the

24

question of concurrent versus consecutive sentences under RCW 9.94A.535(1)[g].[9]

RP at 175.

The trial court made other statements about the applicable law, including stating it was aware of its discretion to impose concurrent sentences as an exceptional sentence for serious violent offenses, RP 167; and including the following:

> I am also taking into account the adolescent brain science considerations set forth in [*Miller v. Alabama*, *Graham v. Florida*, and *Roper v. Simmons*], as that relates to [statutory mitigating factors] subsections [(c), (d) and (e)] of [former] RCW 9.94A.390(1) [1990], as well as considerations under the Eighth Amendment of the United States Constitution and the above-mentioned cases, and the corresponding Washington State Constitutional protections.

RP at 169. The non-exclusive statutory mitigating factors that the sentencing court viewed as potentially implicated by Mr. Ramos's youth, and took into account, were

> (c) The defendant committed the crime under duress, coercion, threat, or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct.
> (d) The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime.
> (e) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, was significantly impaired (voluntary use of drugs or alcohol is excluded).

Former RCW 9.94A.390(1).

---

[9] The statute applicable to Mr. Ramos's sentencing would have been former RCW 9.94A.390(1)(g) (1990), which was substantively identical to recodified RCW 9.94A.535(1)(g).

The argument by Mr. Ramos that the sentencing court was unconstitutionally constrained by pre-*Miller* law depends upon the false premise that when *Miller* was decided on June 25, 2012, it fundamentally transformed whether sentencing courts viewed youth as bearing on culpability and sentencing. *Miller* did make a significant change by declaring mandatory life sentences for homicides by juveniles to be categorically unconstitutional. But it had long been recognized that attributes of youth are relevant in meting out punishment; Washington has had a separate juvenile court since 1905. *See* LAWS OF 1905, ch. 18, § 3 (repealed 1909); LAWS OF 1909, ch. 190, § 3 (repealed 1913); LAWS OF 1913, ch. 160, § 2 (substantially repealed 1977); LAWS OF 1977, ch. 291, § 3. In a 1979 article discussing the 1977 overhaul of Washington's juvenile justice system, a former chief criminal deputy for the King County prosecutor observed that while adults commit many kinds of crimes for many reasons,

> juvenile crime is exceedingly difficult to characterize because juveniles change so rapidly during adolescence and their crime motives are often the result of peer pressure and adolescent experimentation. It is not that there is an absence of variety among adults, but rather much more variety among juveniles.

Jay A. Reich, *The Juvenile Justice Act of 1977: A Prosecutor's Perspective*, 14 GONZ. L. REV. 337, 349 (1979).

Eleven years before Mr. Ramos and Mr. Gaitan murdered the members of the Skelton family, the United States Supreme Court observed in *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), a capital case, that evidence of a

difficult family history and of emotional disturbance was typically introduced by

defendants in mitigation of a capital sentence and that while in some cases such evidence

may be given little weight,

> [W]hen the defendant was 16 years old at the time of the offense there can
> be no doubt that evidence of a turbulent family history, of beatings by a
> harsh father, and of severe emotional disturbance is particularly relevant.
>
> The trial judge recognized that youth must be considered a relevant
> mitigating factor. But youth is more than a chronological fact. It is a time
> and condition of life when a person may be most susceptible to influence
> and to psychological damage. *Our history is replete with laws and judicial
> recognition that minors, especially in their earlier years, generally are less
> mature and responsible than adults.* Particularly "during the formative
> years of childhood and adolescence, minors often lack the experience,
> perspective, and judgment" expected of adults. *Bellotti v. Baird*, 443 U.S.
> 622, 635, 99 S. Ct. 3035, 3044, 61 L. Ed. 2d 797 (1979).

(Emphasis added) (footnotes omitted).

In 2005, six years before Mr. Ramos's first resentencing, the Supreme Court

decided *Roper*, in which it characterized the "lack of maturity and an underdeveloped

sense of responsibility" found in youth as something that scientific and sociological

studies tended to confirm—but that *"any parent knows."* 543 U.S. at 569 (emphasis

added).

In remanding for a second resentencing in 2013, we characterized the Washington

State Supreme Court's 1997 decision in *Ha'mim* as anticipating that evidence

demonstrating that culpability was diminished because of youth would be a factor to

consider in sentencing. Our direction on remand was that Washington legislative

27

findings in 2005 and United States Supreme Court decisions supported the "viability of the brain science offered by Mr. Ramos," which we said was "relevant to a request for an exceptional downward sentence." *Ramos* IV, 2013 WL 1628255 at *13.

In announcing its decision at the 2013 resentencing, the court said that it had "considered the issues advanced regarding adolescent brain science, the mitigating qualities of youth discussed by the United States Supreme Court, and have expressly considered the fact that Mr. Ramos was 14 at the time of these four murders, and I have expressly acknowledged my discretion to adopt a mitigated sentence and run them concurrently if I so choose." RP at 176. The record demonstrates that the court understood that Mr. Ramos's youth could be considered under the three explicit statutory mitigating factors that it identified and as a mitigating factor it could consider even if not explicitly identified by the SRA. The only respect in which the sentencing court viewed itself as constrained by *Law* was that it did not consider Mr. Ramos's post-incarceration rehabilitation other than as evidence tending to prove his reduced culpability for the 1993 murders. We view this as proper, and discuss it further in section IV, below.

*IV. The statutory presumptions of standard sentencing ranges and consecutive sentences are not unconstitutional as applied to juvenile offenders following* Miller

Mr. Ramos next argues that a *presumptive* sentence of life without the possibility of parole for homicide is sufficiently similar to a *mandatory* sentence of life without the possibility of parole to raise a "serious constitutional concern," citing *People v.*

*Gutierrez*, 58 Cal. 4th 1354, 1379, 171 Cal. Rptr. 3d 421, 324 P.3d 245 (2014), and argues that Washington's sentencing scheme of (1) standard range sentences that must be imposed absent substantial and compelling circumstances and (2) presumptive consecutive sentencing for serious violent crimes presents the same constitutional concern presented by the presumptive life without parole sentence at issue in *Gutierrez*. He argues that the combined application of these two presumptions under the SRA resulted in a de facto life sentence for him of 85 years. Br. of Appellant at 14-21.

*Gutierrez* addressed the life without parole sentences imposed on two 17-year-old offenders who were convicted of "special circumstance murder" under California Penal Code section 190.5(b). In one case, the sentence was for the felony murder of a police officer by the defendant's partner in crime, committed while the co-defendant was being pursued following an armed robbery. 58 Cal. 4th at 1362. In the other, the sentence was for a murder of a woman during the commission of a rape or attempted rape. *Id.* at 1366-67.

Here again, Mr. Ramos focuses in his comparison to *Gutierrez* on his total sentence. Had he committed a single murder, like those giving rise to the sentences in *Miller* and *Gutierrez*, the standard sentence range provided by the SRA for a defendant with no prior criminal background would have afforded him a meaningful opportunity for release: he would have been released sometime between ages 34 and 40. Former RCW

9.94A.310 (1992).[10] Mr. Ramos faces the equivalent of a lifetime sentence here not because the sentence for a single first degree murder is categorically disproportionate but because he was convicted of four murders.

None of the United States Supreme Court's precedents under the Eighth Amendment suggest that consecutive sentencing for multiple murders constitutes cruel and unusual punishment. We cannot accept the proposition that a sentencing scheme that is valid under the Eighth Amendment for a juvenile offender who commits a single murder is invalid if an offender commits enough murders that, run consecutively, the sentences approach a lifetime. Youth matters. But so do the lives that were taken. As the United States Supreme Court reiterated in *Graham*, murder is incomparable in terms of its severity and irrevocability, because "'[l]ife is over for the victim of the murderer.'" 560 U.S. at 69 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 449, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008). As observed in *Miller*, it is "beyond question" that a juvenile who commits even one murder "deserve[s] severe punishment." 132 S. Ct. at 2469.

The defendants in both *Gutierrez* and in *Miller* were guilty of single murders and presented issues of sentencing proportionality in that context. Nothing in *Miller* or the precedents on which it relies suggests that proportionality is not affected if the offender has committed multiple murders—and *Graham*'s discussion of the incomparability of the

---

[10] RCW 9.94A.310 was recodified as RCW 9.94A.510 by LAWS OF 2001, ch. 10, § 6.

crime of murder compels the conclusion that committing multiple murders *must* affect the proportionality analysis. Mr. Ramos does not demonstrate any Eighth Amendment problem with the 20- to 25-year sentencing ranges provided by the SRA or its provision for consecutive sentencing of serious violent offenses.

*V. The sentencing court properly reconciled current adolescent brain science and Washington's determinate sentencing scheme in focusing on whether the evidence presented bore on Mr. Ramos's culpability for his criminal acts*

In his 2013 sentencing memorandum, Mr. Ramos argued that in 2011, in *Pepper*, 562 U.S. 476, "the United States Supreme Court recognized that post-crime rehabilitation may indeed be relevant to the history and characteristics of the defendant." CP at 615. One of the questions posed by the sentencing court at the conclusion of the first day of the sentencing hearing was how the discretion of a Washington court, as limited by *Law*, compared to the discretion enjoyed by federal courts under the federal SRA as described in *Pepper*. In announcing its sentencing decision, the court hewed to our reasoning that rehabilitation was only relevant to the extent it made it more probable that Mr. Ramos's 1993 crimes were a result of his emotional and mental immaturity, thereby reducing his culpability.

The United States Supreme Court's decision in *Pepper* was not based on constitutional principles. At issue in *Pepper* was whether an offender's exceptional progress following his original sentencing could be taken into consideration when he was

31

resentenced in light of a policy statement by the Federal Sentencing Commission that

provides in part:

> Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense[,] are not an appropriate basis for a downward departure when resentencing the defendant for that offense.

United States Sentencing Guidelines § 5K2.19 (Nov. 1, 2010).

Applicable federal statutes, by contrast, provide that "[n]o limitation shall be

placed on the information" a sentencing court may consider "concerning the [offender's]

background, character and conduct," 18 U.S.C. § 3661; and include "the history and

characteristics of the defendant" as factors that a sentencing court must consider. 18

U.S.C. § 3553(a)(1). The opinion in *Pepper* noted that the Court had previously held that

district courts must give "'respectful consideration'" to the sentencing guidelines but

may, in appropriate cases, "impose a non-Guidelines sentence based on a disagreement

with the Commission's views." *Pepper*, 562 U.S. at 501, (quoting *Kimbrough v. United

States*, 522 U.S. 85, 101, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007)). It held that the

statutory provisions controlled and enabled a sentencing court in the event of a

resentencing not only to consider post-sentence rehabilitation, but, in an appropriate case,

to rely on it as the basis for a downward departure from the advisory Federal Sentencing

Guidelines range.

32

The fact that the Court was deciding a statutory issue rather than a constitutional one was driven home by Justice Alito's concurring opinion, which discussed the pendulum swing in federal sentencing law in the several preceding decades. Justice Alito remarked that "[a]nyone familiar with the history of criminal sentencing in this country cannot fail to see the irony in the Court's praise for the sentencing scheme exemplified . . . by 18 U.S.C. § 3661" and similar case law, pointing out that "[b]y the time of the enactment of the Sentencing Reform Act in 1984, this scheme had fallen into widespread disrepute." *Pepper*, 562 U.S. at 517, (Alito, J., concurring in part and dissenting in part).

*Law*, not *Pepper*, construes Washington's SRA and is controlling on the issue of the extent to which a Washington court can consider post-sentencing rehabilitation. The sentencing court properly considered Mr. Ramos's post-sentencing rehabilitation solely for its relevance to his culpability at the time of the 1993 murders.

### VI. The State did not breach the plea agreement

Mr. Ramos's sentencing memorandum had asked the court to impose an exceptional sentence of 30 years for the murder of Bryan Skelton and 20 years for the remaining counts, to run concurrently. It identified 10 "mitigating factors" associated with Mr. Ramos's emotional immaturity, lesser culpability, and acceptance of

33

responsibility that it argued supported exceptional concurrent sentencing. CP at 620-21.[11]

A recognized mitigating factor under former RCW 9.94A.390(1)(g) is that a sentencing court may impose an exceptional sentence downward if it finds that the "multiple offence policy of RCW 9.94A.589 [formerly RCW 9.94A.400] results in a presumptive sentence that is clearly excessive in light of the purposes of the [SRA]." *State v. Graham*, 181 Wn.2d 878, 880, 337 P.3d 319 (2014). In arguing against an exceptional downward sentence, the prosecutor addressed that statutory mitigating factor. After arguing, in effect, that each life mattered and each homicide should count, the prosecutor stated:

---

[11] The 10 "mitigating factors" identified by Mr. Ramos were:

New evidence regarding adolescent brains; Supreme Court statements on lesser culpability of adolescents; Joel had little control over his environment—he experienced frequent moves, a language barrier, physical, verbal, and sexual abuse and emotional neglect; at a stage of life when Joel was most susceptible to psychological damage, he experienced the trauma of his sister's unexpected death; Joel was vulnerable to negative influences—he underwent a significant personality change after his sister's death, between 6th and 7th grade; Joel's youth impacted his interactions with law enforcement and the legal system; the fourteen-year-old Joel was immature even for his age; under *Pepper v. United States*, Mr. Ramos's post-crime rehabilitation is relevant substantive mitigating evidence on its own merits; Joel lacked a criminal predisposition and was induced to commit this crime by his codefendant; and Joel Ramos accepted responsibility, waived his decline hearing, and pled guilty.

CP at 620-21.

34

[A]s the Court's aware, the manner and mechanism of death—or injury and death was very heinous. This is—the description that was provided to the Court clearly shows that the people were both bludgeoned to death and then stabbed to death. And in particular the death of Bryan, a six year old, that the defendant admits having committed himself, was particularly heinous.

And I'd like to point out that that death, you know, would have been a basis for an aggravate[d] sentence. And it's the State position that, you know, that's something you have to look at in terms of, well, okay, there's these mitigating factors. Well there's also an aggravating factor. Although, we're not advocating that you give him an aggravated sentence based upon that, I think it's something as part of the crime that the Court can look at. And in particular that Bryan was a young child that the defendant knew or should have known was particularly vulnerable or incapable of resistance due to his extreme youth. And so I think you've got to weigh that in terms of the type of crime that was committed.

RP at 140-41.

Later, in response to the sentencing court's direct questions to the prosecutor as to the extent of its discretion and whether a jury finding was required,[12] the prosecutor stated that the court could not go above the standard range without a jury and could not go below the standard range unless it found, considering the purpose of the SRA, that there were substantial and compelling reasons justifying an exceptional sentence.

The prosecutor had agreed in 1993 to recommend a sentence of 80 months. Mr. Ramos contends that the prosecutor undercut his recommendation by arguing that the

---

[12] Among the court's questions to the prosecutor were, "From the State's point of view, am I bound by the sentencing recommendation?," and "[A]m I authorized as essentially the new sentencing judge to make a decision within the standard sentencing range?," and "[T]hat was the law in effect at the time of the original plea and sentenc[e] in 1993; is that correct?" RP at 144-46.

crimes could have supported an aggravated sentence and suggesting that Bryan had been particularly vulnerable due to his extreme youth. He argues that by presenting facts that the conduct was egregious enough to justify a sentence above the standard range, the prosecutor went beyond what was necessary to explain his sentencing recommendation and breached the plea agreement. Mr. Ramos contends the proper remedy is resentencing before a different judge.

Due process requires a prosecutor to adhere to the terms of a plea agreement. *State v. Sledge*, 133 Wn.2d 828, 839, 947 P.2d 1199 (1997). While the prosecutor need not make the promised sentencing recommendation "enthusiastically," the prosecutor has a duty "not to undercut the terms of the agreement explicitly or by conduct evidencing an intent to circumvent the terms of the plea agreement." *Sledge*, 133 Wn.2d at 840 (citation omitted) (internal quotation marks omitted). "[T]he State will not violate its duty of good faith and fair dealing by participating in an evidentiary hearing and presenting evidence to assist the sentencing court, so long as it does not, by its words and conduct at that hearing, contradict its recommendation for a standard range sentence." *State v. Talley*, 134 Wn.2d 176, 187, 949 P.2d 358 (1998).

In *Sledge*, the court held that the prosecution undercut its agreed recommendation of a disposition within the standard range. Although the court had the manifest injustice report written by the probation officer, the State insisted on a hearing where the State called the probation officer and the juvenile parole officer. The State then questioned

36

both in detail as to their reasons for recommending an exceptional sentence. *Sledge*, 133 Wn.2d at 833-35. Our Supreme Court pointed out that there was no need for the hearing, the questioning "over and over" of the probation officer on her reason for recommending an exceptional sentence, or for calling the parole officer as a witness. *Id.* at 842-43. The court held that these factors together with the prosecutor's summation demonstrated a "transparent attempt to sustain an exceptional sentence." *Id.* at 843.

In this case, the prosecutor's presentation in its entirety reflects compliance with the plea agreement. As set forth above, at the time he discussed the fact that an aggravating factor could apply, he emphasized, "[a]lthough [ ] we're not advocating that you give him an aggravated sentence based upon that." RP at 141. Turning later to the State's requested sentence, he said, "So in this case, the State is asking that the Court continue the sentence of 80 years, which was what was bargained for." *Id.* at 143. When asked by the court whether the prosecutor wished at a later point to make the State's recommendation, or would just as soon "do that now," the prosecutor responded, "Well, the recommendation is to deny the exceptional sentence and just reaffirm the sentence of 80 years." *Id.* at 144. His only reference to the aggravating characteristics of the crime was in opposing Mr. Ramos's argument that mitigating factors justified an exceptional *downward* sentence. As Judge Korsmo had observed in his concurring opinion in *Ramos* IV, "There is nothing to prohibit the prosecutor from arguing against an exceptional

37

sentence (while maintaining its 80-year recommendation)." 2013 WL 1628255 at *18 n.4.

As to the prosecutor's answers to the court's direct questions about the extent of its discretion, *Talley* requires the prosecutor to "answer the court's questions candidly in accordance with RPC 3.3" (requiring counsel to be candid with the trial court), and "not hold back relevant information regarding the plea agreement." *Talley*, 134 Wn.2d at 183. Mr. Ramos's lawyer conceded at oral argument of the appeal that it was proper for the prosecutor to answer. And when Mr. Ramos's lawyer was asked the same question by the sentencing court, she, too stated that she "certainly believe[d]" that the court had discretion to act within the sentencing range. RP at 160.

The prosecutor made the promised recommendation, did not advocate for an exceptional sentence and did not contradict his recommendation.

Affirmed.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, .J.